BLANCHE S. WIER *v.* HENRY HURLEY ET AL.
[No. 102, October Term, 1931.]

*Decided January 14th, 1932.*

The cause was argued before BOND, C. J., URNER, ADKINS, PARKE, and SLOAN, JJ.

*W. LeRoy Ortel,* with whom was *T. Bayard Williams* on the brief, for the appellant.

*Elmer R. Haile,* with whom was *John Mays Little* on the brief, for the appellees.

ADKINS, J., delivered the opinion of the Court.

The bill of complaint in this case was filed by the appellant, sister of Wilbur L. Hurley, deceased, against the appellees, brothers of the decedent, and the descendant of a deceased brother, for the purpose of having the property of the decedent, all of which was personalty, declared to be the property of the plaintiff by reason of an alleged gift from the decedent to her in his lifetime.

The decedent died of pulmonary tuberculosis at Eudowood Sanitarium, on Tuesday, March 19th, 1929, intestate, unmarried, and without issue. The plaintiff and defendants were next of kin. For a number of years prior to his last illness he was employed as a locomotive engineer at the Sparrows Point plant of the Bethlehem Steel Company. He was in good health until April, 1928. Prior to this time he lived with plaintiff, and paid her ten dollars a week board. He seems to have been frugal and to have accumulated a small fortune, amounting to nearly $14,000, of which $10,-640.67 was on deposit in four savings banks, $3,000 invested in three Calvert mortgage bonds, and $100 in a Liberty bond.

On Saturday, March 16th, 1929, the plaintiff and John W. Hurley, one of the defendants, each received a message that their brother was very low and requesting them to come to Eudowood. It does not appear by whom this message was sent. On the same day they went to the hospital; the plaintiff, with her husband, daughter, and her fiancé, Forrest Bruce Bevelhimer, arriving a little after 1 P. M., and John W. Hurley between 5 and 6 P. M. The plaintiff and her party remained about half an hour. All of them except plaintiff, who was disqualified, were offered as witnesses of what occurred at that visit. Charles H. Wier, the husband, testified that the decedent went to the hospital in December, 1928, and remained there until his death on March 19th, 1929, at 3 A. M.; that from 1904 until his illness he lived with witness and his wife and was treated like one of the

family; that on the occasion of their visit on March 16th, the decedent talked about the weather, his physical condition, and general topics; that he asked witness to open the drawer of a chiffonier at the foot of his bed and get out several keys, one of which was the key to his lock box at the Provident Savings Bank, in which the bonds were deposited, and the other, the key of a trunk at witness' home; that he told witness to open the trunk, where he would find the bank books, "and I was to make transfer of those bank books to the wife's name, as he absolutely wanted her to have everything, with the exception of the Liberty bond; I was to open up the box and get the Liberty bond out, and use that for my own use, and also the coupons of the Calvert mortgage bonds. * * * And he says to the wife * * * 'I have given you the Provident Savings Bank book when I came out here. You have that in your hands.' * * * And the remainder of the bank books he transferred into the wife's name. I says, 'All right, Will, I will do so.' In addition to that he presented me with this bill of the hospital. He says, 'Herewith you will find bill of the hospital that I have paid up until the 27th. In the future, any other bills for the hospital you will kindly— or you will take care of them for me, Charley.' I said, 'All right, sir.' "

Plaintiff's daughter and son-in-law gave similar testimony about the conversation and the delivery of the keys. The daughter said he told her father "to take the keys and open his trunk and get the bank books out and to settle everything in my mother's name."

The son-in-law's testimony was that the decedent said to Wier that "he wanted to transfer everything to Mrs. Wier * * * and told him the bank books were in the trunk, and he wanted them transferred. * * * He wanted them transferred as soon as possible. That was his words."

On Monday, March 18th, at about 9.30 in the morning, Wier, with his son Leroy Wier, returned to the hospital. His testimony is that he said to the sick man, "Well, I have done just what you asked me to, I have brought these assignments out to transfer the bank books in Blanche's name"; and that

he replied: "All right, Charlie, raise me up so I can sign it"; "I raised him up, and he was taken with a spasm of coughing. * * * and he said, 'lower me down.' I lowered him down * * * and after a bit, he said, 'Wait a minute, now raise me up again,' and when I raised him up this spasm of coughing had left him in such a weakened condition that his hand was shaking, nervous. I said, 'Do you want me to sign them?' He said, 'yes'; that witness read the assignments to him, and he said 'all right'; and I wrote his name; I said, 'Now touch the pen and make your mark.' He did." That witness' son witnessed the signature; that there were two nurses and another patient in the room at the time; the name of one of the nurses, he afterwards learned, was Miss Maud Moody, "but I ain't positive of who was the other one"; that he asked one of the nurses to witness the signature, but she said that was against the rules of the hospital. All the assignments were offered in evidence. This visit lasted about fifteen minutes.

Leroy Wier testified that he accompanied his father on March 18th; that his uncle recognized him and called him by his name; that they talked about the weather and how he was feeling. "And then he asked Dad if he brought those papers that he had him fix up, and Dad told him, 'yes.' So he tried to take—raise up to sign the papers, and he could not make it * * * he got a coughing spell, and after that he seemed to be awfully weakened and nervous. * * * He tried to hold the pen in his hand, and he dropped the pen and then Dad took the pen and he placed his hand on it and made the marks. * * * Dad read off the contents of each paper before he had him put his mark on it." That there were two nurses and a young lad on a cot in the room.

Dr. William A. Bridges, superintendent of the hospital, testifying for plaintiff, produced the chart, which showed that on March 18th the patient's highest temperature was 97 and it dropped to 95; that his respirations in the morning of that day were 30 and later in the evening they came up to 40; that the normal respiration is around 18, and the normal temperature 98.6; that he was catheterized at 4.45 P. M., which

indicated that he was very weak, and his musculature was weak; that his bladder was not capable of emptying itself.

The defendants offered four witnesses who testified to the condition of the decedent on the 16th and 18th of March.

John W. Hurley, one of the defendants, testified that he worked in the same shop with his brother for about twenty-four years and saw him every day; that when he saw him on March 16th in the afternoon "there wasn't no conversation held at all. I walked in and spoke to him, and he looked at me a little while, and I asked him if he did not know me, and he said, 'no, I didn't any more than know you,' and that is all that was said." That he stayed in the room about three-quarters of an hour; that he was too weak to talk.

Mrs. Mary E. Wagner testified that she was a graduate nurse and had been in charge of the wards at the hospital for four years at the time decedent was a patient there; that she saw him at least two or three times a day, sometimes more, as much as six or seven times when he became so ill; that he was in bed all the time he was at the hospital; that William Hosler, another patient, had a cot in the same room; that the decedent was delirious about two weeks before he died, off and on; that "the last four days that he lived he was absolutely delirious at all times, because there were times when we had to restrain him in bed. He did not know what he was doing, and he would get up out of bed and wander around the wards, the last four days that he lived. * * * Because he talked irrationally; he did not talk with any sense at all. He was getting out of bed without any reason, falling around the floors, and had to be picked up and put back. That was four days before he died. He did not know how to be tidy of himself, take care of himself; he was not capable of that. He just did not know his whereabouts." That while she was not in the room between 1 and 2 P. M. on March 16th, he was delirious a few minutes before that and had been all the time for four days, and there was no change in his condition.

James Thompson, an orderly at the hospital, testified that he was on duty on the day previous from 7 A. M. to 7 P. M.; that decedent for a week before he died would not know any-

body who went in the room, and for four days before he died was out of his head all the time; that he knew this because he had to wait on him.

William Hostler testified that he occupied a cot in the same room; that he remembers some people coming into the room the morning of the day before decedent died; that he did not see him sign any papers or hear any read to him; that about a week before he died he was out of his head.

We agree with the learned chancellor that, on the testimony of plaintiff's witnesses, the alleged gift was not completed on March 16th. Assuming that testimony to be true, it was clearly the intention that the gift should be completed by signing the transfers, which was not done until March 18th, less than eighteen hours before the alleged donor died. So the question is: What was his mental condition at that time? It is hard to reconcile the conduct of plaintiff in taking out letters of administration, as the testimony shows she did, with the theory of an absolute gift by decedent before his death of all his estate to plaintiff. She must have doubted the validity of the gift, or she would not have taken a course which involved the expense of administration, and collateral inheritance tax, besides the loss of the one-fifth interest of the descendants of the deceased brother, who did not sign the alleged release, of which we shall presently speak. It is significant that Miss Maud Moody, a nurse who was in the room at the time the papers were alleged to have been signed, was not produced as a witness, or her deposition taken under a commission, although plaintiff's husband testified as to her residence.

The chancellor, after reciting the facts above mentioned, said: "Under such circumstances I am unwilling to accept the evidence of the witnesses for the plaintiff as to the mental condition of the decedent at the time the transaction, which is the subject of this suit, was executed, all of whom were directly or indirectly interested, that he was mentally competent, as sufficient to overcome or meet the positive testimony of four entirely disinterested witnesses, who had had a better opportunity of observing his conduct and condition, that he

was not at the time mentally competent." We concur in the chancellor's conclusion.

But plaintiff contends that the three brothers who signed what is called a "relinquishment" are estopped to contest the claim of plaintiff. The paper which they, together with the widow of a deceased brother, signed (but which was not signed by the descendants of a deceased brother), is:

"To whom it may concern:

"We, the brothers and relatives of Wilbur L. Hurley, relinquish all claim to any moneys or other estate held by him at the time of his death in favor of his sister, Blanche S. Weir."

That is not an agreement. At most, it is a form of waiver without consideration. It is not under seal. It would probably estop them as against an innocent third party. But we are satisfied from the testimony it was induced by misrepresentation by the husband of plaintiff as to its purpose, and intentional concealment as to the value of the estate.

It was presented to John W. Hurley at plaintiff's home by her husband, while the members of the family were assembled for the funeral. Hurley testifies the paper had been prepared by Wier, who gave it to witness on his arrival and requested him to sign it and to ask the rest to sign it; that Wier said it was "to save court expenses, and if a little bit of money is left we could get it and divide it up and save the court expenses"; that he did not give witness any idea of what the estate amounted to, and witness did not read the paper. The witness and the other signers of the paper all testified that they did not read the paper but signed it on their brother-in-law's representation; that they would not have signed it if they had known that decedent left a substantial estate. Wier seems to have regarded himself, and to have been regarded by his wife's brothers, as the business man of the family, and apparently they all relied on him. The brothers appear to be worthy, industrious people, but with little education. Of course, they should have read the paper. But, as to plaintiff, they had the right to rely upon Wier's representations. He was plaintiff's agent. There is no estop-

pel here. *McGrath v. Peterson,* 127 Md. 412, 96 A. 5'51, and cases there cited.

The chancellor believed these witnesses, and we think he was warranted in so doing. Indeed, there is no substantial contradiction, except that Wier testified that, in presenting the paper to John W. Hurley, witness told him "that Wilbur wanted Blanche to have all his estate."

Even if there had been a valid assignment, it would have availed plaintiff nothing in this case. She could then have asserted her claim in the orphans' court in the distribution of the estate.

*Decree affirmed, with costs to appellee.*